AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* <br><br> One Samsung cellular telephone, using number 808-854-6339, S/N R3CN80HVZFK, currently in the possession of the FBI, 10385 Vista Sorrento Pkwy | Case No.    20MJ4241 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C. § 371 | Conspiracy |
| Title 15, U.S.C. §§ 78j(b), 78ff, and | Securities Fraud |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent David Patterson, incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Special Agent* [signature]

*Applicant's signature*

Special Agent David Patterson, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

___telephone___ *(specify reliable electronic means)*.

Date:   ___09/29/2020___

[signature]

*Judge's signature*

City and state:  San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge

*Printed name and title*

## **ATTACHMENT A**

One Samsung cellular telephone, using number 808-854-6339, S/N R3CN80HVZFK, currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Pkwy, San Diego, California.

**ATTACHMENT B**

The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 371 (conspiracy), and U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud):

1.    Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data from February 1, 2018 to April 1, 2019:

      a.    tending to identify attempts to manipulate the market for the stock of Argus Worldwide "ARGW", including attempts to: obtain control of the stock of ARGW; conceal control of ARGW or stockholding in ARGW; impact the price or trade volume of stock in ARGW; create or revise corporate disclosures; promote ARGW or the stock of ARGW, including through call rooms, newsletters, or websites; buy or sell the stock of ARGW; distribute proceeds from the sale of the stock of ARGW;

      b.    tending to identify accounts, profiles, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the manipulation of the stock of ARGW;

      c.    tending to identify payment, payment methods, or other monetary transactions relating to manipulating the stock of ARGW;

      d.    tending to identify co-conspirators, criminal associates, or others involved in manipulating the stock of ARGW;

      e.    tending to identify travel to or presence at locations involved in manipulating the stock of ARGW;

      f.    tending to identify the user of, or persons with control over or access to, the SUBJECT TELEPHONE;

      g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above; or

      h.    provide context to any of the communications, records, or data

described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail.

**which are evidence of a** conspiracy to commit securities fraud in violation of in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, David K. Patterson, being duly sworn, hereby depose and state as follows:

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the San Diego Division.  I have been employed by the FBI as a SA since February 2013.  My training includes a 21-week FBI new agents' class, during which I received instruction on various aspects of federal investigations. From 2000 to 2013, I worked for a large U.S. bank doing financial reporting, corporate accounting, and capital planning.

2.      While working as an SA, I have conducted, or participated in, investigations of various violations of federal law, including white collar crime.  Among other things, I have conducted, and assisted in, the execution of numerous arrest warrants, search warrants, and seizure warrants in investigations.  Since July 2013, I have been assigned to squads responsible for investigating white collar offenses.  The squad to which I am currently assigned specializes in investigating all forms of economic crime, including corporate, securities, financial institution, and investment fraud.

3.      In the seven years I have been assigned to investigate white collar crimes, I have become experienced in investigations involving all types of economic crimes, including the methods and means employed by individuals who engage in these offenses. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI and other federal agents and officers.  I have attended training courses covering a variety of topics of fraud and white collar crime, and other types of criminal violations.

4.      The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and records related to this investigation; recorded conversations with insiders; communications with others who have personal knowledge of the events and circumstances described herein; and information

gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search and seizure warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation

5.     This affidavit is made in support of an application to search the following cellular telephone:

> a. One Samsung cellular telephone, using number 808-854-6339, S/N R3CN80HVZFK, currently in the possession of the Federal Bureau of Investigation, 10385 Vista Sorrento Pkwy (hereinafter referred to as "SUBJECT TELEPHONE");

for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 occurring from approximately March 2018 through March 2019.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371, and 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 have been committed by the user of the SUBJECT TELEPHONE.  There is also probable cause to believe that a search of the SUBJECT TELEPHONE (as more particularly described in Attachment A) will reveal evidence of these crimes (as more particularly described in Attachment B).

PROBABLE CAUSE

A.     THE INDICTMENT

7.     On January 8, 2020, a federal grand jury sitting in the Southern District of California handed down a sealed indictment against Ongkaruck Sripetch, Michael Wexler, and Andrew McAlpine, among others.  The indictment charges Sripetch with conspiracy to

commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

8.     The indictment alleges, among other things, a conspiracy to conduct a market manipulation scheme.  The scheme involved Sripetch's manipulation of stock of Argus Worldwide Corp. ("ARGW"), which began at least as early as March 2018 and continued until on or about March 2019.

B.     BACKGROUND

Pump-and-Dump Schemes Generally

9.     Based on my training and experience, and from consultation with other agents and securities regulators, I know that fraudulent schemes surrounding the issuance, marketing, and trading of the stock of small, thinly-capitalized (or "microcap") companies have been widespread for years.  Although these frauds vary in their particulars, in a typical scheme fraudsters: (1) secretly obtain control over a small company that has shares of stock that can be publicly-traded; (2) artificially inflate the price of the stock (the "pump") through misleading corporate disclosures, call rooms, and stock promotion techniques (including, for example, penny stock newsletters and internet advertising); and (3) sell their stock into the rising market for significant profits (the "dump").  Stock prices almost invariably go down as a result of the dump, leaving innocent stockholders with significant losses.

10.     There are many aspects of a successful manipulation scheme, including the following:

a.     Roles.  Fraudsters often play various roles in market manipulation schemes.  This is driven by the development of particular competencies and a desire to separate activities so regulators and law enforcement have a harder time linking all aspects of the scheme.  Some people create, or obtain and clean up, a corporate shell that is suitable for manipulation.  Others promote the stock through call rooms, internet pages, or penny stock newsletters.  Still others hold the conspirators' shares that they will sell into the rising market and distribute the proceeds to the conspirators.  All of these players are essential to

3

a successful scheme, and fraudsters sometimes reach an agreement on who covers what costs, and how much of the proceeds will go to which conspirators.

b.      Controlling the Company's Outstanding Shares. Manipulators are more successful when they control larger blocks of free trading shares. This allows them to impact the market price more easily, and decreases the chances that other market participants will place downward pressure on the stock price while the conspirators are trying to increase the price.

c.      Nominee Accounts. Manipulators almost always control bank and brokerage accounts, but often hold those accounts in the name of other individuals or entities. This hides the fact that, e.g., those persons involved in the manipulation also manage and control significant aspects of the business, and persons selling stock into a rising market (the "dump") are also responsible for promotional efforts. Spreading out the shares among a larger number of nominee accounts also conceals that one person or group is responsible for most of the open-market activity in a stock, and facilitates manipulative trading in the stock.

d.      Press Releases and Corporate Developments. Stock manipulators are able to sell the majority of their shares at relatively high prices by getting innocent investors interested in the stock. Fraudsters often spend significant time developing an idea or product that the company is supposedly pursuing. They then cause the company to issue press releases. These releases often have a nugget of truth that is exaggerated or presented in a misleading way. Press releases are often issued in conjunction with efforts to promote the stock in other ways.

e.      Stock Promotion. Stocks are sometimes promoted through high-pressure call rooms, stock newsletters, and advertisements on finance websites. The point of these efforts is the same as that of press releases – to get everyday investors interested in the stock, which will increase demand for the stock. This has two salutary effects: the stock's price and volume increase, and the fraudsters have enough people to whom to sell

their stock at inflated prices.  Promotions often tout recent corporate disclosures as a reason to buy the stock.

        f.    <u>"Building the Chart."</u>  Fraudsters commonly trade stock between two or more accounts that they control, and engage in other forms of manipulative trading.  Seeing a recent history of increases in the price and volume of a given stock often incentivizes investors who have been exposed to promotions – investors who look up the stock chart on the internet can see upward trends that solidify their decision to invest in the company.

        g.    <u>Controlled Stock Sales.</u>  Fraudsters often seek steady, consistent and predictable movements in a stock's price and volume.  They are able to get and keep investors interested in the stock if the price goes up steadily, as opposed to suddenly.  This way, the conspirators can sell shares for longer periods of time, and ultimately sell more shares for higher prices, on average, than they can when there are dramatic swings in prices and volumes.  Fraudsters also seek to avoid sudden shifts because they would rather not attract the attention of regulators and law enforcement.  Even during the promotional period, they also engage in manipulative trading to support the appearance of strong investor demand for the stock.

        h.    <u>Distributing the Fraudulent Proceeds.</u>  One person or group of fraudsters is often responsible for selling the conspirators' shares into the market.  They then transfer money through intermediary accounts, many of them offshore, when distributing the proceeds to the fraudsters who were responsible for other aspects of the scheme, <u>e.g.</u>, the company's management or the shell broker.

<u>The Individuals and Entities Involved</u>

11.    Ongkaruck Sripetch – also known as King or Shelby Saint-Claire – currently resides in Gig Harbor, Washington. Based on a public LinkedIn page and correspondence with the United States Securities and Exchange Commission ("SEC"), Sripetch runs a stock promotion website called Stockpalooza. According to the Nevada and California Secretary of State websites, Sripetch also controls several entities used to maintain brokerage and bank accounts. King Mutual Solutions, Inc. ("King Mutual") is a Nevada corporation

controlled by Sripetch. Sripetch is listed as the signatory on King Mutual's US Bank account. Optimus Prime Financial, Inc. ("Optimus Prime") is a California corporation with Sripetch listed as an authorized signor for Optimus Prime's bank account. A review of Sripetch's bank records, indicate that he also controls a company called Adtron, Inc. In September of 2018, a complaint charging Sripetch and a confidential human source ("the CHS") with conspiracy to manipulate security prices in violation of 15 U.S.C. § 78i(a)(1) based on matched trades of the stock of a company called VMS Rehab Systems, Inc., was obtained. The complaint against Sripetch was not executed because the CHS decided to cooperate. Based on the evidence gathered in the case discussed below, I believe Sripetch was involved in the manipulation of the stock of Argus Worldwide Corporation (Ticker: ARGW, or "ARGW"). Since, at least 2014, Sripetch partnered with CHS until the CHS began cooperating with the FBI as more fully described below.

12.    CHS – CHS, a resident of California, was approached by FBI agents in September 2018 with the complaint described above. CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with Sripetch, Michael Wexler, Andrew McAlpine, and others, regarding the manipulation of stock.

13.    Michael Wexler – Wexler is a Canadian citizen, who currently resides in Ottawa, Ontario, Canada and is the CEO of ARGW and VMS Rehab Systems. Wexler was introduced to Sripetch in connection with a previous scheme related to VMS Rehab Systems. Recorded conversations between the CHS and Wexler indicate that Wexler controls companies, Derving Enterprises and Spectrum Global Diversified Corp, which he uses to receive and conceal payments.  Based on the evidence gathered in this case, much of which is discussed below, I believe Wexler was involved, along with Sripetch, in the manipulation of the stock of ARGW.

14.    Andrew McAlpine – McAlpine is a Canadian citizen, currently resides in Grand Cayman, Cayman Islands.  Recordings made by the CHS with McAlpine and Sripetch indicate that McAlpine controls Dunstaffnage Corporation and was formerly a

broker with Legacy, an offshore brokerage which has a history of being involved in penny stock manipulation schemes.  Based on the evidence gathered in this case, much of which is discussed below, I believe McAlpine was involved, along with Sripetch and Wexler, in the manipulation of the stock of ARGW.

15.    Argus Worldwide – Argus Worldwide traded on the OTC Market under the ticker symbol "ARGW."   According to a press release, ARGW was a Wyoming-based company with affiliate offices in Poland, Canada, and the Netherlands, and purported to be engaged in "digital/internet products and services, smart consumer electronic products and health industries such as generic pharmaceuticals."

C.    ARGW MANIPULATION SCHEME I (March 2018 – July 2018)

    Control over ARGW Stock

16.    According to the CHS and verified by records submitted by the conspirators to the CHS's brokerage firm, on or about March 1, 2018, Wexler gave 1.5 million shares of ARGW stock to the CHS. Wexler provided the CHS a signed letter stating, "no repayment is expected or implied in this gift," which enabled the CHS to deposit the shares in his brokerage account. The CHS has stated to agents that this letter falsely implies that the shares were a gift and that, in reality, Wexler fully expected to be paid after the shares were liquidated. According to the CHS and verified by brokerage records, on or about April 3, 2018, the CHS deposited 800,000 of the 1.5 million shares of ARGW stock into his personal brokerage account.

    Matched Trading

17.    Based on my training and experience, and discussions with securities regulators, I know that one type of manipulative trading involves matched trades.  A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (a) creating a false or misleading appearance of active trading in any publicly traded security or (b) creating a false or misleading appearance with respect to the market for any such security.

18.    Based on reviews of his brokerage accounts, on or about April 6, 2018 Sripetch started trading between accounts he controlled in order to increase the trading volume and price of ARGW stock. My training and experience indicates this was done to create the appearance of an active market for ARGW stock. For example, on April 20, 2018, Sripetch placed an order to sell 250 shares of ARGW for $3.68 per share from one of his brokerage accounts. Twenty-six seconds after placing the sell order, Sripetch placed a buy order for the exact same number of shares at the exact same price from another one of his brokerage accounts. Based on a review of IP address records, both orders originated from the same IP address, which was controlled by Sripetch. Sripetch continued similar activity on multiple occasions throughout April 2018.

19.    Based on information from FINRA[1] and the SEC, the majority of trading activity in ARGW shares during April of 2018 can be traced to accounts controlled by Sripetch. Wexler knew about Sripetch's efforts to manipulate the price and volume of ARGW shares. On June 7, 2018, WhatsApp[2] chat, the CHS explained to Wexler that they would not be selling a large volume of shares that day: "Not a big push today, just spending money to boost the stock price and create higher average volumes."

The following table sets forth an example of seven of Sripetch's matched trades:

| Date | Owner – Account No. | Buy/Sell | Shares Ordered | Shares Executed | Order Price | Order Time (EST) | IP Address[3] |
|---|---|---|---|---|---|---|---|
| 4/6/18 | Melville - 8880 | Buy | 428 | 428 | $3.60 | 2:59:42 PM | 107.77.228.98 (S) |
| | Sripetch - 0169 | Sell | 500 | 428 | $3.60 | 2:58:35 PM | 40.141.25.170 (S) |
| | | | | | | | |
| 4/10/18 | Melville - 8880 | Sell | 400 | 400 | $3.45 | 12:33:26 PM | 107.77.228.114 (S) |
| | Sripetch - 0169 | Buy | 400 | 400 | $3.45 | 12:33:26 PM | 40.141.25.170 (S) |
| | | | | | | | |
| 4/10/18 | Melville - 8880 | Sell | 300 | 250 | $3.50 | 3:54:09 PM | 40.141.25.170 (S) |
| | Sripetch - 6070 | Buy | 250 | 250 | $3.50 | 3:53:49 PM | 40.141.25.170 (S) |
| | | | | | | | |
| 4/19/18 | Melville - 8880 | Buy | 100 | 100 | $3.50 | 12:07:21 PM | 40.141.25.170 (S) |
| | Sripetch - 7200 | Sell | 100 | 100 | $3.50 | 12:07:32 PM | |
| | | | | | | | |
| 4/19/18 | Melville - 8880 | Buy | 400 | 400 | $3.50 | 12:13:08 PM | 40.141.25.170 (S) |

[1] FINRA or Financial Industry Regulatory Authority is a non-governmental organization that regulates member brokerage firms and exchange markets.
[2] WhatsApp is an instant messaging application. Based on my training and experience, conspirators use WhatsApp and other encrypted communication applications to communicate privately while evading law enforcement and other regulatory agencies.
[3] The letter in parentheses refers to the fact that the IP address is associated with Sripetch in Las Vegas, indicated by "(S)."

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Sripetch - 0169 | Sell | 400 | 400 | $3.50 | 12:13:39 PM | 40.141.25.170 (S) |
| | | | | | | | |
| 4/20/18 | Sripetch - 6070 | Sell | 250 | 250 | $3.68 | 2:28:33 PM | 40.141.25.170 (S) |
| | Sripetch - 0169 | Buy | 250 | 250 | $3.68 | 2:28:59 PM | 40.141.25.170 (S) |
| | | | | | | | |
| 4/23/18 | Melville - 8880 | Sell | 100 | 100 | $3.69 | 1:44:05 PM | 40.141.25.170 (S) |
| | Sripetch - 7200 | Buy | 100 | 100 | $3.69 | 1:43:56 PM | |

Promotional Activity

20.     According to open source databases, the number of press releases issued by Wexler regarding ARGW drastically increased between March and July of 2018. Although ARGW issued occasional press releases before the scheme began, Wexler, in his role as the company's CEO, drastically increased the number of press releases both right before and during the stock promotion.  ARGW issued just three press releases in 2016 and another three releases in 2017.  During the four-month stock promotion in 2018, however, Wexler issued nine press releases.  The press releases discussed ARGW's purported block-chain ventures and its acquisition of an India-based smart electronics company.  Not surprisingly, many of the company's optimistic predictions failed to materialize.

21.     According to the CHS, and based on his conversations with Wexler, the timing of press releases was part of a coordinated effort between Wexler, the CHS, and Sripetch to insure they had maximum impact on the share price of ARGW. For example, on May 14, well after the promotion was under way, Wexler asked the CHS: "Any thoughts on our market?  I am gearing for another release or two before month end."  The CHS quickly replied: "Yes, please release.  We should get one more push in before end of month, having PR before that event will help demonstrably."  As planned, Wexler issued a press release eight days later extolling the virtues of its global aggregator which "will make available to the user a host of new and widely used Internet based applications on a single . . . platform shaping the company's reputation for enhancing the digital experience on line."

22.     In a WhatsApp chat Wexler decided to "let the sheets cool for say 7-10 days then come back with more PR say mid to end next week."  The CHS held Wexler to his promise and, on June 6, 2018, asked Wexler: "Can you put a PR out on Friday?  Even [i]f just in support of the last one."  One week later, Wexler issued a press release announcing

that ARGW planned to "restructure its digital/internet unit under a new global technology business."

23.     A review of PNC Bank records, account ending in 1366, and Bank of America bank records, account ending in 1795, indicates that, on or about May 3, 2018, Sripetch wired $23,000 through his business entity Adtron to Awareness Consulting Network, LLC ("ACN").   Based on market surveillance conducted by FINRA and provided to agents, ACN was known to facilitate internet stock promotions. ACN worked by acting as middle man between a party wishing to promote a specific stock and an internet stock promotion group. ACN would keep a portion of the funds as a fee, and then pay for an internet-based stock promotion group to tout a particular stock. Wire transfer records indicate ACN then wired the funds, less its cut, to Stellar Media Group. Notes on the wire transfers from ACN specifically listed "ADS ARGW 5/3".

24.     FINRA market surveillance indicated that stock promotion websites issued at least 44 email alerts touting ARGW stock between May 3, 2018 and July 6, 2018. In addition to the May 3, 2018 promotion, bank records indicate that Sripetch arranged for at least three other promotions for a total cost of $106,250. The CHS gave Wexler frequent updates about the status of the promotions.

Distribution

25.     According to statements made by the CHS and verified by a review of brokerage records, during the ARGW promotion, the CHS sold approximately 287,070 ARGW shares for proceeds of $750,840, which were then distributed to the CHS's co-conspirators. The CHS paid Wexler approximately $156,877 for his part in the scheme. A combination of CHS statements, chats, and recorded calls between the CHS and Wexler revealed that the CHS sent the money from his personal brokerage account to a corporate bank account. From there, the CHS sent the money to Roberto Ruiz, who controlled Amalia LLC, and Danny Melville, who controlled MDAS LLC. The CHS has since told agents that both Ruiz and Melville appeared to assist Sripetch with low level tasks associated with

trading or laundering proceeds. Ruiz and Melville took a small percentage of the funds and wired the remainder to Derving Enterprises, an entity controlled by Wexler.

26.    The CHS has since indicated that Wexler fully understood that the wires from Amalia LLC represented the proceeds from the CHS's sales of ARGW shares. For example, on June 11, 2018, the CHS wired $41,598 to Amalia LLC. The next day, Ruiz kept $1,000 and wired the remaining $40,598 to Derving Enterprises. On June 12, 2018, the CHS sent Wexler the following message:



27.    On July 9, 2018, the CHS sent Wexler a spreadsheet that listed all of the CHS's sales of ARGW stock on July 5 and July 6, the costs of the promotion, the net profit, and the three way split of the profits between the CHS, Sripetch, and Wexler.

D.    ARGW MANIPULATION SCHEME II (October 2018 – March 2019)

28.    According to the CHS, Wexler, Sripetch, and the CHS, decided to unload the remaining 700,000 shares of ARGW still held in the CHS's account. In August of 2018, the CHS, Sripetch, and Andrew McAlpine, a business associate of Sripetch, met to discuss

McAlpine depositing the ARGW stock into his offshore account with Seven Mile Securities. McAlpine agreed to do so for a 10% commission.

29.     Just weeks after the August 2018 meeting, FBI agents obtained a complaint charging the CHS and Sripetch with manipulative trading associated with a previous pump and dump scheme involving VMS Rehab. The CHS agreed to cooperate and notified FBI agents about the on-going ARGW manipulation scheme. At this time, the CHS began recording conversations with Sripetch, McAlpine, and Wexler.

Test Promotion

30.     Before committing tens of thousands of dollars to a promotional campaign, Sripetch wanted to run a test promotion to ensure that Seven Mile Securities could get the ARGW stock into the United States and would be able to sell the shares in a way that did not unduly drive down the price or attract regulatory scrutiny.

31.     On October 16, 2018, Wexler contacted the CHS using WhatsApp to discuss an idea for an ARGW press release and the timing of the promotional campaign. Wexler then e-mailed a draft of the press release to the CHS. The CHS forwarded Wexler's email to Sripetch. Sripetch became upset that Wexler did not send the release through an encrypted application. Sripetch said to the CHS, "Dude careful on that email from [Wexler]. He shouldn't be sending u stuff like that tell him to send it on Telegram[4]…Dude don't let this idiot fuck it up. No more this is getting serious now in [the] market place he need to be very careful…Ask him if he want to go to jail or go home lol."  Wexler issued the press release the following day.

32.     According to Telegram messages, on November 1, 2018, the CHS and Sripetch discussed the timing of a press release and promotion using the Telegram app[5]. The CHS forwarded Sripetch a message from Wexler regarding a new press release. Sripetch responded by telling the CHS "put it out now I think be best." Sripetch then told the CHS

---

[4] Similar to WhatsApp, Telegram is an application which conspirators believe enables them to communicate without detection by law enforcement.
[5] Based on statements by the CHS, Sripetch goes by the name Shelby 2 within the Telegram app.

that he booked the promotion for $5,500. Sripetch and the CHS then discussed coordinating stock sales with McAlpine.

33.     A review of bank records indicates that on November 2, 2018, Sripetch, using his entity, Adtron, wired $5,500 to ACN as part of the smaller test promotion. ACN, in turn, wired $5000 to Advanced Branding LLC to conduct the promotion. On November 4 and 5, Immaculate Stock Alerts disseminated promotional emails touting ARGW stock. Based on my review of the emails, at least one of the emails included a disclosure that ACN paid for the promotion.

34.     Agent observation of the website "otcmarkets.com" indicated that as soon as the test promotion started, the OTC Markets stock exchange flagged ARGW stock as the subject of a promotion, which meant that Seven Miles Securities could not trade in ARGW stock for fifteen days.  Sripetch decided to hold off on a larger promotion for several months.  Instead, Sripetch and McAlpine agreed to match trade ARGW stock at prearranged prices through the market.  These illegal matched trades would achieve two important objectives.  First, the conspirators would transfer stock from McAlpine's offshore account to Sripetch's domestic account, which would make it easier to dump shares into the market during the next promotion.  Second, the matched trades would continue to prop up ARGW's share price and give the appearance that there was an active market in the stock.

Manipulative Trading

35.     A review of TD Ameritrade and Bank of NY brokerage records, as well as consensually recorded telephone calls and text messages, indicated that on January 11, 2019, Sripetch and McAlpine executed their first trades for the purposes of getting ARGW's stock into Sripetch's U.S. brokerage account while also increasing the price and volume of the stock. Based on training and experience, CHS statements, and calls recorded by the CHS, match trading was done for the purpose of increasing the price and volume of a stock. Sripetch began by purchasing three blocks of ARGW totaling 16,500 shares. In a series of WhatsApp group chats on that same day involving, Sripetch, McAlpine, and the CHS the

group discussed orchestrating trades in ARGW stock. Sripetch became concerned that McAlpine's broker was slow to execute one of the orders, asking do we "really want to pump the buying with [the broker] taking this long?"

36.    On January 14, 2019, Sripetch and McAlpine continued matched trading. WhatsApp chats from the same day reveal that Sripetch instructed McAlpine when to sell his shares. Sripetch told McAlpine "Andy, let's go .35…..hang on…..Order in .35 5k shares…..Hit it" McAlpine responded, "Ok." Immediately after, Sripetch said, "Next order will be bigger," to which McAlpine responded, "He has it." A review of brokerage records indicates that on this date, Sripetch purchased 80,000 shares at $0.35 per share from McAlpine by breaking up the purchases over four transactions: 5,000 shares; 15,000 shares; 25,000 shares; and 35,000 shares.

37.    On a January 14, 2019 telephone call recorded by the CHS, Sripetch, McAlpine, and the CHS discussed McAlpine's concerns that match trading in small blocks would take weeks to get all of the shares into Sripetch's brokerage account. Sripetch responded that trading in large blocks would attract regulatory scrutiny.

> Sripetch: "I mean I can do the whole thing. It just-it just-it just comes down to do we wanna spook the market, you know. Now when I say spook, spook the market, it doesn't mean just the market makers and everybody in it. I'm talkin' about the FINRA."
>
> McAlpine: "Right, no of course."

Based on my training, experience, and discussions with other agents, FINRA performs market surveillance for indicators of market manipulation activity and makes referrals to the SEC.

38.    Brokerage records indicate that on January 15, 2019, Sripetch and McAlpine conducted a final round of matched trades, with Sripetch purchasing a total of 100,000 ARGW shares from McAlpine in two blocks for $0.35 per share.

39.    After six weeks of manipulative trading, Sripetch began preparing for the full promotion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Promotion

40.    In  a January 15, 2019 WhatsApp chat between Wexler and the CHS, Wexler told the CHS he had an ARGW press release ready to go, but Wexler wanted the CHS to check with Sripetch about the timing. The CHS sent Sripetch and McAlpine a screenshot of his discussion with Wexler; Wexler issued the press release the next day.



41.    According to bank records, on January 17, 2019 Sripetch paid $22,500 to ACN for an upcoming promotion of ARGW. ACN then paid Stellar Media Group to run the promotion. McAlpine and the CHS were both aware Sripetch had booked the promotion because Sripetch had contacted them through WhatsApp stating "Gents about to wire out for promo…Just want to confirm we all know the cost $22.5k booked for Feb 4th."

Liquidation and Distribution

42.    A review of brokerage records and consensually recorded telephone calls, revealed a coordinated effort to liquidate ARGW stock. On November 5, 2018, in

15

coordination with the November 4 and 5, 2018, test promotion, McAlpine sold 12,500 shares of ARGW stock for $9,065.

43.    On February 4, 2019, in coordination with the full-scale promotion, McAlpine sold 155,000 shares of ARGW for proceeds of approximately $94,600. The same day, Sripetch sold 193,950 shares of ARGW for approximate proceeds of $119,000. After the market closed on February 4, 2019, the SEC halted trading in ARGW stock.

44.    On or about March 7, 2019, Sripetch sent the CHS a spreadsheet, which the CHS provided to agents, detailing that Sripetch, the CHS, McAlpine, and Wexler each earned an equal split of the profits from the ARGW pump-and-dump.

45.    Beginning with the first test promotion and March 2019, ARGW's stock price plummeted from nearly $4 to $0.10 and has not recovered to date.

*ARGW Stock Chart From January 2018 through November of 2019*



## PROBABLE CAUSE SURROUNDING THE SUBJECT TELEPHONE

46.    According to phone and email records I have reviewed, Sripetch (who lived in Las Vegas, Nevada during the scheme), the CHS (who lived in Southern California), Wexler (who lived in Ottawa, Ontario, Canada), and McAlpine (who lived in the Cayman Islands)

communicated frequently over the course of the scheme. These communications included a significant volume of phone calls, emails, and text messages, including messages transmitted via encrypted messaging platforms, such as WhatsApp and Telegram.

47.     Sripetch was known by the CHS to utilize three to four cellular phones at any given time. These included both Android and iPhones. The CHS primarily contacted Sripetch at the SUBJECT TELEPHONE, which the CHS reported was a longtime telephone number used by Sripetch.

48.     The CHS also communicated regularly with Sripetch via Whatsapp and Telegram apps. These included both chats and telephonic conversations. According the CHS, Whatsapp channels included those tied to the SUBJECT TELEPHONE and kingrichards3000@gmail.com, an email address known by the CHS to be utilized by Sripetch. According to the CHS, Sripetch uses the username Shelby 2 and the phone number associated with the SUBJECT TELEPHONE within the Telegram application. The CHS communicated with Sripetch, via the "Shelby 2" Telegram username associated with the SUBJECT TELEPHONE as recently as January 27, 2020.

49.     Based on my review of numerous account application documents and discussions with other agents familiar with the investigation, Sripetch listed the number of the SUBJECT TELEPHONE on numerous account application documents, including for King Mutual brokerage accounts and the following accounts under his personal name: Interactive Brokers, Alpine Securities Corp. and Fidelity accounts.  Based on this, I believe Sripetch used the SUBJECT TELEPHONE as a means to conduct brokerage business and to further the schemes described above.

50.     In May 2017, an undercover employee (UCE) communicated with Sripetch first over SMS text and then over Telegram (text and telephonic call).  On September 17, 2020, the UCE accessed the Telegram chat with Sripetch and could view all the communications within the Telegram chat extending back to 2017.  Based on my training and experience of how the Telegram application works, the fact that the UCE was able to

see communications extending back to 2017 means that Sripetch had not deleted the communications from the SUBJECT TELEPHONE.

51.   Sripetch most recently communicated with the UCE over Telegram using the number associated with the SUBJECT TELEPHONE on September 17, 2020.

52.   Based on my training and experience, the encrypted apps Sripetch used to communicate with the CHS and Wexler, including the apps described above that are associated with the SUBJECT TELEPHONE at accounts Sripetch controlled, are often used on a cell phone, and these apps are readily available in the relevant app stores.

53.   Based on my training and experience, and from discussions with the CHS, I know that fraudsters – including Sripetch – often retain emails, bank records, notes, spreadsheets, text messages, chats, and other telephonic communications for lengthy periods of time for the purpose of referring back to terms and other relevant discussions from previous transactions.

54.   The SUBJECT TELEPHONE is currently in the lawful possession of the FBI. It came into the FBI's possession in the following way:  On September 18, 2020, Sripetch was arrested at his residence located at 2515 68th Avenue Ct NW,  Gig Harbor, Washington, 98335.  While agents were with Sripetch inside his residence, other agents called the phone number associated with the SUBJECT TELEPHONE.  Agents could hear a phone ringing in Sripetch's pocket.  Agents asked Sripetch if that was his phone, and he answered in the affirmative.  The SUBJECT TELEPHONE was then seized from Sripetch incident to his arrest.

55.   On September 28, 2020, agents in San Diego received a shipment containing the SUBJECT TELEPHONE.  The SUBJECT TELEPHONE is currently in storage at 10385 Vista Sorrento Pkwy, San Diego, California.  In my training and experience, I know that the SUBJECT TELEPHONE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT TELEPHONE first came into the possession of the FBI.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

56.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in airplane mode, which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

57.     Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

58.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the

identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

CONCLUSION

59.    Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5, and will be found at the telephone to be searched as provided in Attachment A.

Special Agent David K. Patterson
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 29th day of September, 2020.

HONORABLE MICHAEL S. BERG
UNITED STATES MAGISTRATE JUDGE